## UNITED STATES v. NATIONAL SURETY CO.

### SAME v. TOWNER.

#### Nos. 909, 910.

District Court, D. Montana.

Sept. 8, 1938.

John B. Tansil, U. S. Atty., of Billings, Mont., for plaintiff.

Stewart & Brown, of Helena, Mont., for defendant National Surety Co.

Geo. E. Hurd, of Great Falls, Mont., for defendant Wellington S. Towner.

PRAY, District Judge.

It was stipulated by counsel in both of the above-entitled causes that the issues of fact be tried and determined by the court without the intervention of a jury, in accordance with Section 773 of Title 28 U.S.C.A., and, accordingly, both cases were tried in that manner and at the same time. The result in the Towner case, under the pleadings, would determine the result in the case of the Surety Company. The defendant Towner held a permit from the government to prospect for oil and gas at a place known as Vimy Ridge, in a "wild cat" region, so called, and situated about fifty miles from a producing well. The defendant's agent drilled a well under the permit and discovered no oil or gas, according to the best evidence, and the question here arises over the method of abandonment of the well and whether it sufficiently conformed to the statute and regulations adopted in pursuance thereof. The case for the government is stated, in substance, to the effect that these two actions are against the grantee of an oil and gas permit and his surety to recover the cost to plaintiff of plugging the well drilled under the permit, with three major propositions in view, relied upon by the plaintiff for a recovery, as follows: (1) a duty owed by the defendants arising from the permit, bond and governing regulations of the Department of the Interior; (2) a breach of that duty by the defendants' failure properly to abandon the well drilled by the permittee's agent; and (3) the damage to plaintiff for doing what defendants failed to do. The permit was issued October 17th, 1922, under Act of February 25th, 1920, 30 U.S.C.A. §§ 22, 48, 181 et seq. The bond was furnished by the defendants Towner and National Surety Company. A test well was completed under the permit about April 20, 1923, by $20 Bill Syndicate, a corporation, the agent of defendant Towner. F. X. Schwarzenbeck was the government engineer who had supervision of this well, for brevity's sake he will be referred to hereafter as the engineer or supervisor. He wrote a letter to one A. F. Bragdon of the syndicate, dated April 10, 1923, in respect to the abandonment of the well; the government claims that the method set forth in the letter was not followed. Thereafter, on June 7th, 1929, the government let a contract for plugging and marking this well for the consideration of $8,975. This occurred about six years after the officer hav-

ing supervision of the well had to do with its abandonment as shown by his deposition taken in San Francisco, in January, 1923, wherein he stated, among other things, that it was his duty to supervise the drilling and abandonment of wells in this district. On March 29th, 1923, the syndicate wired the officer a plan of abandonment asking approval or else immediate inspection as the work crew was being held at heavy expense;. after receiving the telegram the officer went to the well; he found a flow of water which did not contain a trace of oil or gas; he was there alone when he inspected the place; it was called Vimy Ridge; was about 50 miles from any producing well; it was decided that it was flowing water in sufficient amount for irrigation and watering cattle; "the wire received outlined the method of plugging the well, which was unsatisfactory to government regulations, so I formulated a method used to plug the well, according to government regulations, or gave them the choice of leaving the casing in the hole so as this water could be used.

"Q. And what method was finally agreed upon, plugging or leaving the casing? A. Leaving the casing.

"Q. So the casing was left in the well? A. It was.

"Q. And the water was left? A. As far as reports were made out to the office."

At the time the officer examined the well and approved its abandonment, the casing was left in the well and water allowed to flow to the surface; no other requirements except to fill out certain forms for Winnett office, unless the derrick was to be removed then the hole should be marked by a pile of rocks, or the hole covered up; such a marking would cost less than $50. He determined there was no oil or gas present by examining the water and tasting it, the method used in the field. The supervisor believed he had authority to adopt an alternative plan as he was in charge of the territory; he actually agreed with the parties on the alternative plan, and that was, that the driller of the well might leave the casing in the hole, instead of filling it up, "with the supposition that it would naturally mud itself over and prevent any further flow of water; that is, in time."

The records of the office should show confirmation of this alternative plan; every report and all correspondence on any well was kept in separate files, segregated; the agreement for this plan was made with Dorsey Hager; Mr. Hager and Mr. R. P. Jackson corresponded with him regarding affairs of this syndicate. The engineer at this time had supervision over 500 wells in many different fields throughout Montana, North and South Dakota and Idaho. Nine years had elapsed since the occurrences related in his deposition but he had access to letters and correspondence relating to the well before testifying to refresh his recollection. The operating company was allowed to leave 1,597 feet of 8¼-inch casing in well; it was left to protect any possible oil bearing sands, and would protect such sands. The engineer testified that he found confirmation on the ground of that conclusion when he visited the well; there he found the casing intact and the water flowing over the head of the casing, and it was found to be clear and pure; this witness was the representative of the Bureau of Mines whose duty it was to examine the reports on this permit, No. 052028, who would be notified of any proposal to abandon the well, and who had authority to pass upon the terms and conditions of such abandonment. The supervisor further stated that cases would come up where the regulations did not fit—were not practical, and that under such circumstances he exercised his own judgment. From a perusal of the terms of the permit it does not appear that there was any breach thereof by the permittee or his agent, and the abandonment took place under the authorization and direction of the only duly authorized representative in charge, under the Bureau of Mines and Secretary of the Interior.

Counsel for the government cite operating regulations governing the production of oil and gas under the Act of February 25, 1920, as promulgated by the Secretary of the Interior June 4, 1920, and other regulations bearing subsequent dates. Under the heading "Purpose of Supervision" appears the following language: "Realizing that any specific and binding regulations drawn for one or even the majority of fields may not be applicable to certain other districts, the following regulations are purposely broad in scope, leaving the details of interpretation to the supervision and the local deputies who are empowered to alter or modify these regulations as conditions may warrant." And again under Section 1. "Powers and duties of supervisor and his deputies": "It shall be the duty of the supervisor and his deputies—* * * (L) To re-

quire the correction, in a manner to be prescribed or approved by him, of any condition existing subsequent to the completion of a well which is causing or is likely to cause damage to any formation bearing oil, gas, or water, or to coal measures, or other mineral deposits, or which is dangerous to life or property or wasteful of oil or gas." And the following: "(P) Before plugging or abandoning a well the lessee shall submit to the deputy supervisor or his representative the detailed plans for carrying on the work, together with duplicate copies of the log in case it has not already been submitted, and proceed with the plugging or abandonment only by receiving the approval of the deputy supervisor." From Bulletin 232 it appears that "procedure (in abandonment) varies from well to well, and, as previously stated, methods employed in one well will not be suited to another * * * as a rule, the abandonment of a dry or non-productive wild cat well which is not adjacent to a known productive area will not be subject to the same rigid requirements as a well in a proved field. However, the abandonment of such a well may embody the protection of usable waters from pollution, and possible oil or gas bearing strata or coal beds from injury." The evidence shows that the well was abandoned to the satisfaction of the supervisor in charge and the regulations confirm his own belief expressed in his testimony that he was allowed considerable latitude in the exercise of his judgment in abandoning wells, taking into account all the circumstances surrounding each particular well. When plaintiff undertook to replug the well in 1929 a mere trickle of water was found coming over the casing and it appeared that the very thing had happened that had been predicted by the former supervisor six years before and heretofore quoted from his testimony. If properly abandoned at that time, during the six years that followed, could any damage or injury that may have occurred be charged to defendant? Again, was the charge of $8,975 a reasonable charge under all the facts of the case, and is it reasonable and just to hold that the regulations would authorize such procedure and expenditure? By the regulations the supervisor and his deputies were given broad powers and discretion, and if conditions seemed to warrant might alter or modify such regulations. The lessee could not abandon or even alter the casing in the well without notifying the supervisor and receiving his approval. There appears to be no question that permittee fully complied with all of the terms of the lease up. to the time of abandonment. If the supervisor exercised a reasonable discretion in the discharge of the duties devolving upon him would not the government be bound by his acts?

The statute (Section 225, U.S.C.A., Title 30) provided: "Permittee * * * will * * * use all reasonable precautions to prevent waste of oil or gas developed in the land, or the entrance of water through wells drilled by him to the oil sands or oil-bearing strata, to the destruction or injury of the oil deposits." There was no oil or gas developed in the land, or any showing of oil bearing sands, or any injuries to or destruction of any oil deposits. The possibility of destruction to any oil deposits would seem to depend upon the migration of water, and the nearest proven field was about fifty miles away, with no proof that the oil strata in the proven field was similar, or had any relation, to the strata encountered in the well in question. Even the trace of oil mentioned was described by the witness Stevenson as merely a false alarm. The supervisor tested the water coming from the well and said it was clear and pure. Five or six years later another agent of the government visited the well for the first time and decided that the abandonment was insufficient, and yet there was nothing in the proof to show that conditions found at this time requiring, in his judgment, further work on the well were not entirely different from those existing several years before when the well was abandoned under the direction of supervisor Schwarzenbeck. The defendant's action having been properly approved by the supervisor, and he appearing to have been the only officer clothed with full authority to act in the field at that time, can the government now object or is it bound by such approval? He had the authority even to alter or modify regulations to fit conditions as he found them to be, and it does not appear that there was any improper exercise of such authority.

█ Where a statute, and regulations adopted in pursuance thereof, confer a broad discretion upon an officer, as in this case, it seems to be the rule that one dealing with him in good faith may assume that the officer has properly exercised that discretion; and so a government agent may bind the United States by the exercise of a reasonable discretion in the conduct of the affairs in which he is engaged. 65 C.J. Sec. 38, pp. 1276, 1277, and cases cited.

Another question raised by counsel for defendant relates to the reasonableness of the expenditure of $8,975 in an effort to replug the well, and the citation of authorities in support of the rule that a party cannot unnecessarily increase damages and thereafter expect to recover. "It is a familiar rule that a party suffering loss from breach of duty ought to do what a reasonable man would do to mitigate his loss." Brady v. Interstate Commerce Comm., D. C., 43 F.2d 847, 849; United States v. United States F. & G. Co., 236 U.S. 512, 35 S.Ct. 298, 59 L.Ed. 696, and cases cited in both decisions. It has already been shown why it is necessary to plug a well.

It appears in evidence that when the work was undertaken to replug the well that a mere trickle of water was found; that a bridge was encountered 500 feet down; that this bridge was driven down about 1,650 feet when it became a solid bridge; when this bridge was drilled out a flow of water was encountered. The supporting bridge was removed and on drilling deeper caving became so serious that little headway could be made, but the driller finally reached a depth of about 1,793 feet. All of this apparently unnecessary effort and great expense was resorted to, as a "reasonable precaution to prevent waste of oil and gas * * * or the entrance of water through wells drilled by him to the oil sands or oil-bearing strata" as required by the Act of 1920, above referred to, in a field acknowledged to be in wild cat territory, and fifty miles from a producing well. The 1,597 feet of 8¼-inch casing was left in the well. The witness Nadeau, was called for the plaintiff, and while his testimony was not very informative or convincing either way, it does appear he admitted that good field practice would have required the salvaging of the 1,597 feet of casing during the progress of these elaborate replugging operations. Two witnesses testified that the reasonable value of the casing was $3,000 in one instance and $3,150 in the other.

In view of the facts and circumstances of the case as the court now understands them, and applying the rules of law that seem to govern, it appears to be the plain duty of the court to render judgment for the defendant and with costs of suit in his favor, and such is the decision of the court in both cases.

The objection to the advertising feature at the end of the log, Ex. 6, is sustained and it is eliminated from consideration.

Defendants may submit formal findings of fact and conclusions of law in conformity with the foregoing views of the court, and plaintiff is allowed an exception in each case.